## MONSANTO CHEMICAL CO. v. COE, Commissioner of Patents.

### No. 8472.

United States Court of Appeals
District of Columbia.

Argued Jan. 21, 1944.

Decided June 26, 1944.

Mr. Harold T. Stowell, of Washington, D. C., with whom Messrs. J. Russell Wilson, of St. Louis, Mo., Herbert J. Krase and Ralph E. Parker, both of Washington, D. C., were on the brief, for appellant.

Mr. E. L. Reynolds, of Washington, D. C., with whom Mr. W. W. Cochran, Solicitor, United States Patent Office, of Washington, D. C., was on the brief, for appellee.

Before GRONER, Chief Justice and MILLER and ARNOLD, Associate Justices.

ARNOLD, Associate Justice.

The invention in this case is based upon the discovery that by fusing substances containing tetrasodium pyrophosphate and sodium metaphosphate products may be obtained which are superior for use in softening hard water. On this discovery the Patent Office has allowed five claims covering the process of adding to hard water the products of the fusion of different named substances which contain the above chemicals. Eight claims were refused and are made the basis of this proceeding to compel the issuance of a patent under Section 4915, R.S., 35 U.S.C.A. § 63. These claims cover the process of adding to hard water certain specifically named chemicals called triphosphates and tetraphosphates, which are the most efficient of the products included in the allowed claims. The difference between the allowed claims and the refused claims is difficult to analyze. The allowed claims include all the products of the fusion of certain starting agents and emphasize the idea of fusing. The refused claims do not mention fusion but do cover by name certain of the products which are contained in the allowed claims.

The case is presented by the complaint as if each of these multiple claims were a

distinct invention which the Patent Office had refused to recognize.[1] The Patent Office argues that the refused claims are (1) not supported by appellant's disclosure, and (2) not patentable over the prior art. The disclosure is the use in hard water of a number of products of the fusion of certain materials. Appellant argues in effect that the disclosure of the use of *all* the products includes the disclosure of the use of *each* of them. The Commissioner replies that the applicant did not disclose that some of the products were better than others, hence the disclosure of all of them cannot be considered as the disclosure of any particular one of them. Appellant rejoins that their disclosure shows the unpredictable superiority of the products selected by these claims over the prior art and that this is all that is required, citing Patent Office procedure. In the view we take of this case it is unnecessary to decide between these two contentions, each of which appears equally plausable.

The second question, whether the claims are an advance over the prior art, leaves us with two opposing answers, which can be supported with equal logic. The Patent Office has decided the discovery of the use of *all* the products of the fusion has the quality of invention whereas the discovery of the use of the specified products within the group has not the quality of invention. This seems based upon the notion that the element of originality here consisted in using *fused* products rather than the particular chemical substances which constitute the fused products. But the evidence is that the only known way of producing these substances is by way of fusion. If any patentable discovery exists here it is impossible to split it up into abstract component parts along those lines. The attempt to do so makes it impossible to reach an intelligent conclusion on the issues of this case. A more realistic analysis is required in order to understand the question before us.

The artificial presentation of the case as a series of distinct inventions stems from the practice of the Patent Office to allow a large number of claims to be filed for the same thing. In most patent applications which contain multiple claims the theory that they represent distinct inventions is pure fiction. The skilled patent draftsman will not attempt to describe the scope of his patent in a single claim because of the danger that if the claim is too broad it will fail entirely. Therefore, a large number of claims are made on a single discovery, each spreading the patent in a different direction like the ribs of an umbrella. The idea is that if some of these claims cover too much the others will still be enforceable. The procedure is somewhat similar to the old practice of describing a single cause of action in a common law declaration in as many counts as possible, each of which represented a different theory of the same case. Thus, the skilled patent draftsman will first describe the invention in mechanical terms from which he will get as many claims as there are wheels or cogs or substances the use of which he wants particularly to emphasize. Then, on a different level he will describe the invention as a process, emphasizing as a separate claim each specific means to attain the result. Then, on yet another level he will describe the invention in terms of the generalized function it performs, in the hope that this may not be held to be too broad. Then claims will be drawn from an engineering point of view, as a new application of a mechanical or scientific principle. Finally, for good measure the aspects of the invention will be expressed in different degrees of polysyllabic complexity in order to give the appearance of profundity.[2] This process of elaboration cannot by any stretch of imagination be

---

[1] "41. Two or more independent inventions can not be claimed in one application; but where several distinct inventions are dependent upon each other and mutually contribute to produce a single result they may be claimed in one application: *Provided,* That more than one species of an invention, not to exceed three, may be claimed in one application if that application also includes an allowable claim generic to all the claimed species. In the first action on an application containing a generic claim or claims and claims to more than one species thereunder the examiner, if he is of the opinion after a complete search that no generic claim presented is allowable, shall require the applicant in his response to that action to elect *that species of his invention to which his* claims shall be restricted if no generic claim is finally held allowable." Rules of Practice, United States Patent Office 1942, 35 U.S.C.A.Appendix.

[2] In addition to claims made for the purposes above outlined there is the practice of copying claims from the patents or patent applications of others

called the setting forth of distinct inventions.

■ What multiple claims actually do in the ordinary case is to state a single invention in as many different ways as possible in order to give the resulting patent as much scope as possible. Assuming that the discovery rises to the level of invention, the question of which of these multiple claims shall be allowed is simply a question of how much protection to afford the patentee. In determining whether the Commissioner has given adequate scope properly to protect the discovery the claims which he has allowed must be considered as well as those which have been refused.

To consider the multiple claims in an ordinary patent application as distinct inventions is to confuse two issues which arise in nearly every patent case, and which must be kept separate if the discussion is to be intelligible.[3] The first issue is whether the discovery itself shows invention on the part of the applicant.[4] The second is the degree of control over the present and future development of the industry which the inventor should have as his reward. The first question requires an evaluation of the inventive achievement in the light of the prior art. The second question requires the practical application of the Constitutional mandate that patents should be granted to promote science and the useful arts. The scope of the patent should not be so great as to violate that purpose. If this is kept in mind the dangers created by low standards of patentability, which inevitably creep into a system where so much

depends on individual judgment controlled only by the vaguest of criteria, are minimized. Even a patent on mere ingenuity will do little harm if the court or the Patent Office examines evidence of industrial facts with a purpose of so defining the scope of the patent that others equally ingenious are encouraged to invent a substitute.

■■ There is only one possible way to determine the proper scope of protection for a single discovery. That is to examine the actual degree of control which the inventor hopes to gain by means of all of his claims taken as a whole, over competing industry and competing invention. It is the duty of the Patent Office and of the courts to see to it that the reward is not in fact so large as to violate the Constitutional mandate by discouraging invention by others and thereby impeding the progress of science and the useful arts. Const. art. 1, § 8, cl. 8. Whether or not a patent will have that effect is not a theoretical inquiry; it is a highly practical one. If an inventor acquires a patent on a can opener the fact that others may not make this particular appliance will encourage the development of other types of can openers and stimulate invention. This furthers the Constitutional purpose of the patent grant. On the other hand, if the can opener patent goes beyond the particular appliance and includes the method or process of opening cans it may easily become so broad that others are prevented from making or inventing new can openers. This defeats the purpose of the Constitutional provision. To deter-

___

to be used as counts in interference proceedings. This is nothing more than a device to compare similar patents detail by detail so that if their scope overlaps the question of priority may be decided. Some of the claims before us are copied. With respect to these copied claims there is a question whether the court had jurisdiction to direct the granting of a patent in the absence of an administrative finding of priority over the holder of the patent from which they were copied. However, since we are deciding the case on other grounds this question will not be discussed.

3 In addition there is the danger that if multiple patent claims on a single invention are treated separately the applicant may get what appears to be several distinct patents on a single discovery. This gives him an unwarranted advantage over others in the field. For example, in the case of Ethyl Gasoline

Corporation v. United States, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852, a patent was granted on tetraethyl lead, an anti-knock fluid. The same invention was also described as a mixture of tetraethyl lead and gasoline, and this also was patented. The same invention was also described as the burning of the mixture in an automobile, and this also was patented. The patent monopoly of one of these so-called distinct patents was then illegally used to protect and expand the patent monopoly of another. Not only in attempts to control prices but also in attempts to control competing production through infringement suits it may be of importance whether a claim is actually a distinct invention or only a descriptive detail of another invention.

4 Potts v. Coe, 1944, 78 U.S.App.D.C. 297, 140 F.2d 470, 60 U.S.P.Q. 226.

mine whether the allowance of any particular claim will have such a result requires an inquiry into the facts of the industrial situation: How much control does the inventor expect to get by virtue of the claim which has been refused? How will that control probably affect the activities of others in the field? Such inquiries require evidence not only from the inventor but from disinterested experts or competitors who are aware of the monopoly problem in the field of the patent. To review a record involving the scope of a patent without such evidence is like deciding a case in which the testimony of an interested adverse party has been excluded.

Of course, as in most patent questions, in determining the proper scope of a patent the court must exercise its judgment or guess in the light of judicial knowledge and the facts before it. But a vital public interest demands that such a broad discretionary judgment be exercised only when evidence is before the court bearing on the industrial control which the patent probably will give. This public interest becomes increasingly important as modern patent applications seek to acquire control over the formulae and principles of complex modern technologies such as chemistry where the court has no expert knowledge or experience to guide it. In an earlier time when most patents were on machines or mechanical appliances neglect to consider industrial facts in adjudicating the scope of a patent had less serious consequences. Every American, including the judiciary, is more or less familiar with machinery. Furthermore, the variety of possible machines is as unlimited as the permutations and combinations of wheels and cogs and levers. Each machine is a specific thing, not an abstract idea. Mechanical invention is on the circumference of the inventive circle where there is plenty of room. But modern industrial technology is concerned with patents on ways of doing things rather than on the machines which do them. A patent on a formula or a way of doing a thing is tied down to no concrete model. It floats in the air like a balloon without moorings, capable of being blown in any direction by the currents of logic and analogy. Patents involving processes or formulae may be turned into monopoly claims on the body of technical information which control the progress of the industrial age of light metals and chemicals which lies before us. The control of a single chemical process may spread out in an ever-increasing radius covering every type of machine which uses the principle. He who has the exclusive right to use and prevent others from using technical principles necessary for the development of machines stands at the center of the inventive circle with power to lock up industrial progress and to obstruct the general use of modern science and experimentation.

It is for this reason that in many industries the careless extension of a patent on a formula or a way of doing things has already turned patents into instruments to suppress new inventive ability, new experimentation and new initiative. Industrial empires have been given power to suppress production and to organize domestic and international cartels through patents of carelessly defined scope which created a prima facie monopoly right over technical information. The shift from the old machine appliance patent to the new type of patents on scientific principles has gradually extended over the basic industries of our economy. It is imperative that we recognize that the change in the character of modern invention requires critical examination of the scope of each process patent in the light of evidence on the probable control which that scope may give in complex and unfamiliar fields such as chemistry.

The scope of a patent is not often discussed by courts as a problem separate from patentability. Yet we submit that this distinction is actually involved when courts deny a patent on a "function" or a "result" or an "idea", and allow one on a method or a process or an application of a principle.[5] There is no clear distinction

---

[5] In O'Reilly v. Morse [56 U.S. 112, 15 How. 112, 14 L.Ed. 601], discussed below in the text, the Supreme Court did in fact discuss at great length the potential danger to science and the useful arts of sustaining the following claim made by the inventor of the telegraph: "Eighth. I do not propose to limit myself to the specific machinery or parts of machinery described in the foregoing specification and claims; the essence of my invention being the use of the motive power of the electric or galvanic current, which I call electro-magnetism, however developed for marking or printing intelligible characters, signs, or letters, at any distances, being a new application of that power of which I

between these opposing sets of words.[6] But it is apparent from the results of the decisions that when a court calls a claim functional it is simply saying that the claim

claim to be the first inventor or discoverer."

It cannot be denied that the above claim did in fact describe Morse's discovery. Nor is it indefinite in the sense that it does not disclose how much of the art Morse claimed—he claimed the art in its entirety. It is, therefore, apparent that the real vice of the claim lay in its conflict with the Constitutional mandate.

An analysis of General Electric Co. v. Wabash Appliance Corp., 1938, 304 U.S. 364, 58 S.Ct. 899, 901, 82 L.Ed. 1402, discloses the manner in which the Constitutional mandate has been synthesized with the statutory requirement that the applicant submit "a distinct and specific statement of what he claims to be new, and to be his invention." The Court there said: "The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights."

Yet the claim in that case was definite if it be conceded that the patentee was entitled to everything he claimed. The force of the Court's statement that "a characteristic essential to novelty may not be distinguished from the old art solely by its tendency to remedy the problems in the art met by the patent" is derived from the Constitutional provision. It is apparent that a specific claim to all solutions of an industrial problem is bad, not because it is vague, but simply because the allowance of such a claim would block the progress of science and the useful arts. This analysis is clearly reflected in the opinions of Judge Mack, in an infringement suit:

"The opinion of Chief Justice Taney (in O'Reilly v. Morse) clearly shows that the distinction which plaintiff seeks to establish between a claim invalid for lack of sufficient description and a claim invalid because it claims too much, is in some cases at least an illusory one. In the instant case, just as in Wyeth v. Stone [Fed.Cas.No.18,107] and O'Reilly v. Morse [15 How. 62, 14 L.Ed. 601], the difficulty was occasioned by failure to incorporate in the claim a sufficient description of the invention; the result, however, was not an indefinite claim, but a claim broader than the patent law permits. Cf. Holland Furni-

ture Co. v. Perkins Glue Co., 1928, 277 U.S. 245, 247, 48 S.Ct. 474, 72 L.Ed. 868. Claim 37 fully states the result to be accomplished by the invention, but the only means described for accomplishing it are a series of switches—i.e., push buttons. *The ambit of the monopoly sought was not thereby made obscure, for any system controlled by electric switches for accomplishing the same result, would clearly have been an infringement."* Otis Elevator Co. v. Pacific Finance Corp., 9 Cir., 1934, 68 F. 2d 664, 669, certiorari denied 293 U.S. 593, 55 S.Ct. 108, 79 L.Ed. 687. (Italics added.)

And again, on rehearing of the same case (9 Cir., 71 F.2d 641, 642):

"We cannot agree with petitioner's argument that, in the master's view, the indefiniteness of this claim was analogous to that of a deed intended to cover a definite rectangular piece of land, the description of which, however, omits one of the four sides and thus leaves the extent of the grant completely indefinite. *The kind of indefiniteness, which in our judgment the master had in mind, broadened rather than obscured the scope of the claim, because despite the failure expressly to include the circuits, the ambit of the monopoly sought was completely bounded by the description of the results to be accomplished, with the additional limitation to the particular means—the switches and switching mechanism—described in the claim."* (Italics added.)

[6] See Judge Learned Hand dissenting in Bragg-Kliesrath Corp. v. Farrell, 2 Cir., 1929, 36 F.2d 845, 854: "Courts keep repeating that a function is not patentable and there is indeed the highest authority for saying so. Yet I suppose that nine claims out of ten are drawn for 'means' for doing this or that. What that is but a claim for a 'function' I have never been able to see. If there be any such rule, it seems to me more honored in the breach than in the observance; surely it cannot be that it can be evaded by so simple a device as the use of this nearly universal word."

And again in Roberts Numbering Mach. Co. v. Wetter Numbering Mach. Co., 2 Cir., 1931, 54 F.2d 461, 462: "In some sense all claims are necessarily functional, and indeed the chief problem for courts is how far generalization is permissible."

Compare Smith v. Snow, 1935, 294 U. S. 1, 55 S.Ct. 279, 79 L.Ed. 721, and Waxham v. Smith, 1935, 294 U.S. 20, 55 S.Ct. 277, 79 L.Ed. 733, with General

permits control which will impede science and the useful arts.[7] When it says the claim is a patentable method it in effect expresses the conclusion that the probable area of control is not too large. We are, therefore, asserting no new principle here. We are simply pointing out that such conclusions cannot be intelligently reached in our complex modern technology without expert evidence from men who know the industrial field and the probable control the inventor may reasonably expect or his competitors reasonably fear from the grant of a functional claim.

It is true that when mechanical patents have been before the court it has been able from its own experience and without evidence to guess the probable effect of extending the scope of such a patent beyond the actual mechanical structure to cover the process or method. Thus in the case of O'Reilly v. Morse, 1853, 56 U.S. 62, 112, 15 How. 62, 112 et seq., 14 L.Ed. 601, the Supreme Court of the United States was able to foresee the dangerous possibilities of extending the scope of a patent on telegraphic machinery to the transmission of words by electrical impulses, and to deny that extension on the Court's own knowledge.[8] But today in the crowded field of chemical invention a court cannot even make a guess from its own experience as to the actual scope that a patent on a chemical formula may afford.

If the question of the scope of a patent is treated in the light of industrial facts and treated separately from the question of patentability much of the present conflict in the decisions and in the practices of the Patent Office as to whether a patent should be granted on mere novelty or restricted to a veritable flash of genius may become academic. The only real problem is to prevent patents from becoming a monopoly

---

Electric Co. v. Wabash Appliance Corp., 1938, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402, and Holland Furniture Co. v. Perkins Glue Co., 1928, 277 U.S. 245, 48 S.Ct. 474, 72 L.Ed. 868.

"In this case we have an attempt to convert an improved machine into an abstraction, a principle or mode of operation, or a still more vague and indefinite entity often resorted to in argument, an 'idea.' Those who use the latter term seem to have no fixed idea of what they mean by it. But it may be used as successfully to mystify a plain matter as the words used in the specification." Burr v. Duryee, 1864, 68 U.S. 531, 1 Wall. 531. 576, 577, 17 L.Ed. 661.

[7] Notes 5 and 6, supra. The authors of a series of excellent texts on the patent law have so observed:

"A cogent factor which always should be, and often is, in the minds of the examiners in pronouncing on a claim and of the courts in judging its validity, is the question of whether the granting or upholding of the claim will further the fundamental purpose of Art. 1, Sec. 8 of the Constitution. This consideration dominates and limits any and all rights of inventors granted under the statutes made to carry out the purpose of this section of the constitution.

"It is from this factor that objection to what are called functional claims has arisen. The basic objection is not that a claim is functional but that it is so broad as to cut off all paths of approach to the solution of a problem and stifle all effort at improvement in a given field of progress. * * *

"The considerations which should determine this question are not capable of concise expression applicable to all individual cases.

"The human mind is so constituted that under such circumstances it takes refuge in what are aptly termed 'thumb rules.' Thumb rules are statements of conclusions easily applicable to certain types of questions that may arise and, to give them due credit, will sometimes point to the correct solution.

" 'Functional claims should not be allowed' is merely one example of these unreliable guides." Glascock and Stringham, Patent Law (1943), § 5300, p. 316.

"A claim for what is noninventive over old art is always invalid. And even a claim limited to what is taken to be inventive over old may be invalid if the tribunal feels that the claim is excessively, unreasonably broad; the tribunal tries to gage what seems to be so broad as to exclude others from territory which it feels to be outside the range of a fair scope of protection." Stringham, Patent Claims (1939), Vol. 1, p. 54.

[8] See also General Electric Co. v. Wabash Appliance Corp., supra note 5; Holland Furniture Co. v. Perkins Glue Co., 1928, 277 U.S. 245, 48 S.Ct. 474, 72 L.Ed. 868; Koebel v. Coe, 1939, 70 App.D.C. 261, 105 F.2d 784; Minnesota Mining & Mfg. Co. v. Coe, 1940, 72 App. D.C. 183, 113 F.2d 512. "But an inventor may not describe a particular starch glue which will perform the function of animal glue and then claim all starch glues which have those functions * * *." Holland Furniture Co.

on technical progress in defiance of the Constitution. Gadget patents of little scope are safe enough. Even bright idea patents short of genius may be safely awarded provided their scope is limited after a critical investigation of their probable effect on the industry. Patentability requires originality. The question of scope requires an inquiry into the actual industrial control a patent may give in order intelligently to apply the Constitutional mandate.

██ Applying these considerations to this case it is apparent that only a single discovery is involved. It is not tied down to any machine or model. It is a discovery of a portion of the chemistry of softening water. Assuming that the Patent Office is correct in holding that the idea is inventive the sole question is the amount of control that should be allowed to the inventor as his reward. It is logically possible to give him control over the use of a wide variety of materials regardless of how they are produced.[9] It is equally logical to restrict his control, as the Patent Office has done, to the idea of using the familiar process of fusion of certain named materials in order to get a range of products for use in hard water. In order to determine between these alternatives we must start with information as to how much actual control over this field of chemistry the allowed claims give. Only then are we in a position to say whether the plaintiff is entitled to a scope beyond these claims. We must then have information as to the amount of control which the inventor can reasonably expect if the refused claims are granted in order to ascertain whether that added control would impede the progress of the art. Such information is not within the experience or judicial knowledge of the court. It can only be supplied by the introduction of expert evidence, at least some portion of which should be from disinterested witnesses. There is no evidence in the record which supplies that information. The burden of proof is on the plaintiff to show that he is entitled to more than the Patent Office gave him. Since he has not met that burden the judgment of the court below dismissing the complaint will be

Affirmed.

GRONER, Chief Justice, concurs in the result.

---

v. Perkins Glue Co., supra, 277 U.S. at page 256, 48 S.Ct. at page 479, 72 L.Ed. 868.

[9] In Burr v. Duryee, 1864, 68 U.S. 579, 1 Wall. 579, 581, 17 L.Ed. 660, the Supreme Court noted how a claim might be expanded or contracted at will on the strength of "pure logic".

"A comparison of the devices used in the two machines would be unintelligible without models or drawings. The Taylor patent is but for a form, or rather a combination of known devices, to perform a certain operation and produce a certain desirable effect. The combination used by Boyden is not a mere colorable or substantial adoption of the same combination of devices. It has as much claim to originality as that of Taylor; but it has a vibrating concave surface of cloth, pressing against the cone. Accordingly, the reissued patent to Taylor, or rather to Burr, got up after an examination of Boyden's machine, contained this interpolation in the description of his invention, 'A vibrating concave surface held by pressure,' &c., &c.; and the claim extended to the 'combination of a vibrating concave surface;' then followed the words, 'substantially as described.' In a contest with a previous patent, the last words can be called in to qualify the first, and narrow it down to the peculiar combination of devices described; while, in assaulting a new combination, for the purpose of suppressing it, the claim may be stretched to cover every machine having a 'concave vibrating surface,' by calling all the other parts 'equivalents.'"

In the case of Universal Oil Products Co. v. Globe Oil & Refining Co., 64 S. Ct. 1110, the Supreme Court considered the situation in the oil cracking industry in limiting the scope of a patent.