**POTTS et al. v. COE, Com'r of Patents.**

No. 8189.

United States Court of Appeals
District of Columbia.
Decided Aug. 7, 1944.

For former opinion, see 78 U.S.App. D.C. 297, 140 F.2d 470.

Harold B. Whitfield, of Chicago, Ill. (Cecil B. Hamilton, of Washington, D. C., on the brief), for appellants.

E. L. Reynolds, U. S. Patent Office, of Washington, D. C. (W. W. Cochran, Sol., U. S. Patent Office, of Washington, D. C., on the brief), for appellee.

Before MILLER, EDGERTON, and ARNOLD, Associate Justices.

ARNOLD, Associate Justice.

This is a motion to vacate our decision in the case of Louis M. Potts and Teletype Corporation v. Conway P. Coe, Commissioner of Patents,[1] and to withdraw the opinion filed in support of that decision. The moving parties had appealed from a judgment dismissing their complaint brought under Section 4915, R.S., 35 U.S.C.A. § 63, to require the Patent Office to grant patents on certain claims relating to an automatic stock quotation board capable of giving nationwide service. Our decision affirmed the order of the court below dismissing the complaint. The

---

[1] 1944, 78 U.S.App.D.C. 297, 140 F.2d 470.

ground for the present motion to vacate is that in affirming the District Court we raised and decided a question not presented by the record and based our opinion on facts found in investigations authorized by Congress.

The record shows that the discovery was made by an employee of a corporation which was financing technical research in the communications field. The real party in interest is the Teletype Corporation, a wholly owned subsidiary of the Bell System which dominates research and manufacture in the communications field by means of thousands of patents and rights in patent applications.[2] The alleged inventor, who is only a nominal party here, was a research engineer for the affiliated Western Electric Company and the Bell Telephone laboratories from 1920 to 1928. From 1928 to date he has been employed as a research or development engineer by the Teletype Corporation for the purpose of developing new methods and apparatus in connection with printing telegraph systems.

■ We will restate the principle on which our decision rests and which appellants claim was improperly injected into the case. Where a corporation, as assignee of one of its employees, seeks a patent on a discovery made in the course of its organized technical research it must assume a different burden of proof from that imposed where the discovery is the product of independent inventive genius. The corporation, which in substance is seeking the patent, must show that (1) the employee is the real inventor, and (2) the discovery is above the level of the art current in its own corporate laboratory and other corporate laboratories with which it has connections and affiliations. Such a burden is not met merely by showing that the discovery is an advance over the art shown in technical literature outside the laboratory or in previous patent application by others.

■ We believe this result is compelled if we apply the fundamental principles of the patent law to the actual facts of the complex modern technology of corporate research laboratories. These principles are · (1) that a discovery which is the result of step-by-step experimentation does not rise to the level of invention; (2) that invention must rise above the level of accomplishment of the ordinary skilled technicians engaged in the art; (3) that the patent law must be so administered as to promote science and the useful arts. These three somewhat overlapping principles are questioned by no one:

■ Our opinion holds that in applying these principles to discoveries which arise out of the experimentation of modern organized corporate research we must take judicial notice of the character of that kind of enterprise. Unless we do so the patent law may become a cloak under which a corporate group may prevent the independent use of modern technical information by obtaining patents on the step-by-step progress of scientific knowledge. The methods employed by successful corporate research are well known. It has become a device by which a corporation may get a patent on what has been called "know how", which means the technical skill which large groups of men acquire through extensively financed experimentation and cooperation.[3] By taking an assignment in advance from each employee

2 Report of the Federal Communications Commission on the Investigation of the Telephone Industry in the United States, made pursuant to Pub.Res.No.8, 74th Cong., H. Doc. No. 340, 76th Cong., 1st Sess. (1939).

3 It is a commonplace that licensees of processes resulting from corporate research are ordinarily purchasing information. For example, R. T. Haslam, Vice President of the Standard Oil Co. of New Jersey, testified as follows:

"I had, as a technical man for the Standard Oil Co. of New Jersey, two alternatives. * * * One was to spend twenty years of my lifetime and the lifetime of a lot of others to try to catch up with where the Germans were and then build from that

point on, or to buy their knowledge, bring it to America, and build upon it, because, in the first place, we in America, while we were not as of that date ahead of the Germans in the field of catalytic chemistry, we were ahead of them, in chemical engineering. * * * I know that I. G. owned. some American patents and Bergius owned some American patents. * * * Therefore I recommended in 1927 to the board of the New Jersey Company, and repeatedly in 1928 and 1929, that they buy this knowledge and put it to work here in America."

"Mr. Fath. Would not the simplest thing have been to get a patent license?

"Mr. Haslam. That is what we did. When I say we bought them, I mean we

the corporation appears to satisfy the requirement that there be an individual inventor.[4] But the corporation is the real applicant, and the man whose name appears on the patent is only a nominal party. Furthermore, though the discovery may appear to be a startling innovation, actually it is frequently the product of years of research by many men who come and go,[5] who consult each other and the employees of other corporations with which their own employer has affiliations and agreements. The result is a gradual advance in scientific knowledge made possible because large funds have been spent on research—not an invention.[6] The use of this accumulating body of technical information is denied to the public and to new enterprise whenever a patent is granted on this kind of "discovery". Corporate patenting of this character gives the first private group that trains its employees in a modern industrial technique the right to prevent others from using the same knowledge which they may obtain by similar methods.[7] For that reason acquisition of control over technical education acquired by years of routine experimentation has become a major patent policy of domestic and international cartels.

■ We do not deny that patentable invention may exist in a case where a corporation seeks a patent on the work of one of its employees who has been engaged in organized research. But the essential nature of corporate research makes such a situation unusual for two reasons. In the first place, the incentive to invent supplied by the patent law will not work in organized research because it destroys

---

bought the patents plus the know-how and the technique. * * * We joined with them and took that knowledge and went to work very energetically, * * * " Hearings, Committee on Patents, United States Senate, 77th Cong. 2d Sess., (1942), on S. 2303 and S. 2491, Part 9, pp. 5041, 5042 and 5044.

Examples are numerous. See especially the testimony of S. C. Kelton, Secretary, Rohm & Haas Co., Philadelphia, Pennsylvania, where he testified that when the company bought the plastic and Plexiglas inventions they were "getting the benefit of the intelligence and research which had been done by Dr. Rohm for a period of 30 years or more in Germany." Ibid., Part 2, p. 915.

[4] As explained by F. B. Jewett, a director of research of the Bell System: "This contract is generally similar to those customarily in force throughout applied science industries where patentable inventions are likely to evolve. It provides for the assignment to the employer, without specific payment, of patents on inventions in the line of the employer's business made during the period of employment or with use of his facilities." Jewett, The Relation of Research and Invention to Economic Conditions (1939) 21 J. Pat. Off. Soc. 195, 199, 200.

[5] Mr. R. T. Haslam of Standard Oil of New Jersey testified in this regard. "In Germany it so happens that Germany was not merely a decade but for 50 years have been ahead of other countries in several lines of chemical research and it is only in comparatively recent years, namely, since the last war which we entered in 1917, that America began to catch up. But you do not catch up in a couple of years. I am talking about 1927, one decade after the last war. Today we are much further ahead, partly because we have gone to the four corners of the earth to get that knowledge." Hearings, supra note 3, at 5045.

The acquisition of knowledge from all over the world is not the process of invention. It may be profitable to pay technicians for that "know how" but that does not entitle the corporation which paid for it to have a legal monopoly on its use.

[6] As Mr. Jewett, a research director of the Bell System, explained: " * * * money expended on properly organized and conducted research and invention is probably the safest and most profitable money industry handles; safest because the very processes employed by such research are an almost absolute guarantee against major technical failures in the end product; most profitable because the return on the investment in research cost is extremely high both in direct money return and in insurance of continued life to the industry." Jewett, supra note 4, at 207.

[7] Mr. F. B. Jewett has stated in a memorandum the value of the Bell System's early radio research as follows: " * * * the patent position to which we had attained was such what [sic] even the outside holders of fundamental patents, essentially of interest to them in connection with the development of radio in fields not of primary concern to the Bell System, could not develop these fields without securing rights under our patents." (Emphasis supplied.) Report of the Federal Communications Commission, supra note 2, at 209, which sets forth excerpts from the memorandum.

team work and cooperation.[8] If one man or even a small group is competing with the others to be prior in invention, joint experimentation on a large scale becomes impossible. This has been pointed out over and over by men familiar with successful research. It might be said that only in a very poorly organized research laboratory is individual invention at all likely.[9] In the second place, the research laboratory has gradually raised the level of industrial art until discoveries by ordinary skilled men, which would have seemed miraculous in the last century, are definitely predictable if money is available for organized research. The laboratory level of the art has become the level which the discovery must surpass in order to rise to the dignity of invention. The level outside the laboratory is years behind the times. The level of the laboratory art is not disclosed in current literature, or in previous patent application for the simple reason that it is not to the interest of the corporate research organization to make it public. For that reason **patentability** of a corporate research product cannot be determined by reference to literature. The employed technicians of organized research dominate the scientific societies and write the technical literature. But they cannot be expected to disclose facts adverse to the patent position of their employer. On the contrary, the temptation is always present to describe the art in such a way as to improve their employer's patent position by self-serving [10] and sometimes even fraudulent literature.[11] To permit a corporation to obtain a patent on the work of its employee without further investigation than by references to literature and practices outside the laboratory is to disregard completely the vital public interest in the administration of the patent law.[12]

■ Today, when the strangling effects on industrial progress and the promotion of patent cartels, through the growth of

---

[8] "An earlier system of combined salary and special payment for patents form of reward was abandoned nearly thirty years ago. This was because it was found to be an apple of discord among employees, destructive of team operation, and a distinct injustice to men doing creative work of equal or greater value to the business in fields not subject to the provisions of the patent law." Jewett, supra note 4, at 200.

[9] "Organized industrial research has done infinitely more than change the relation of inventors to society and enlarge their opportunities, however. It has opened up whole areas for application of science in which the lone inventor never has and never can operate. These areas are those in which the problems are so complicated and the processes of their solution so involved and expensive, that they can be attacked successfully only by teams of men, each a specialist in a limited field and part of an organization provided with large funds and many facilities." Ibid, at 201.

[10] The policy which must be followed if corporate investment in research is to be protected can be illustrated over and over again by excerpts from correspondence of corporate officials on corporate policy. The following inter-office letter from the files of the General Electric Company is typical:

"We are much surprised that Mr. Schroeder was permitted to publish an article of this kind without having first submitted it to the General Electric Patent Department. *As I believe you fully appreciate, sometimes articles written by an inventor from whom we have the patent rights may be embarrassing to us and may be used against us in case we have to bring infringement suits which involve the patents of that inventor or even patents of a more or less similar nature on inventions which may not be made by that inventor but which we may own.* \* \* \*

"We do not know exactly what system the Osram Company have in regard to looking over articles by their employees before publication. As you know, we have in this country a rigid routine which provides that all articles written by our employees before publication must be submitted to the Patent Department in order to see that no statements are made which may affect our patent situation \* \* \*." (Emphasis supplied.) Hearings, supra note 3, Part 1, at 412, Lewin Exhibit No. 70.

[11] Hazel-Atlas Glass Co. v. Hartford-Empire Co., 64 S.Ct. 997. This case shows how the necessary policy of preserving the employer's patent position through nondisclosure of the level of the art in the laboratory inevitably leads to articles which are fraudulently prepared in order to improve its patent position by more positive means than mere non-disclosure. Here the corporate owner of a research laboratory procured an article to be written and signed by an outsider in order to win a patent suit.

[12] Hazel-Atlas Glass Co. v. Hartford-Empire Co., 64 S.Ct. 997, 1001;

"This matter does not concern only private parties. There are issues of great

the fiction under which corporate patenting has been inadvertently approved, are written large in the investigations authorized by Congress, appellants argue that we have no right to consider such public hearings in applying the principles of the patent law to corporate research. This argument is not worthy of serious consideration. The purpose of economic investigations by Congress is not only to promote sensible legislation; it is also to aid in the intelligent interpretation and administration of the law. Facts brought out by such investigations are particularly important in construing the patent law since it must effectuate the broad economic purpose defined in the Constitution as the promotion of science and the useful arts.[13] Furthermore, we have used Congressional investigations only to illustrate characteristics of organized research that are obvious without their support. The patent law is designed to encourage competition among inventors by giving a patent to the ingenious individual who wins in a race for discovery. The modern corporate research laboratory is a negation of this principle because it is compelled to suppress competition between individuals. Instead, the race is between the financial interests that organize the laboratories. The result is that a corporation, by successfully eliminating competition for prior discovery between individuals, receives the statutory reward offered to encourage the individual effort which it has suppressed. A court which grants patents on an assumption contrary to these facts [14] is guilty of affirmatively promoting a fiction which inevitably leads to the monopoly grants to corporations on the technical education of our time.

We suspect that the underlying reason for appellants' objection to our opinion is not that it is based on judicial notice of the facts of industrial research. It is rather that it lays down a principle of law which is not acceptable to appellants.

moment to the public in a patent suit. The Mercoid Corporation v. Mid-Continent Investment Company, 320 U.S. 680, 64 S.Ct. 268 [decided January 3, 1944] ; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363."

[13] Motion Picture Patents Co. v. Universal Film Mfg. Co., 1917, 243 U.S. 502, 510-511, 37 S.Ct. 416, 418, 61 L.Ed. 871, L.R.A.1917E, 187, Ann.Cas.1918A, 959:

"3d. Since Pennock v. Dialogue, 2 Pet. 1, 7 L.Ed. 327, was decided in 1829, this court has consistently held that the primary purpose of our patent laws is not the creation of private fortunes for the owners of patents, but is 'to promote the progress of science and the useful arts' (Constitution, art. 1, § 8),—an object and purpose authoritatively expressed by Mr. Justice Story, in that decision, saying:

" 'While one great object [of our patent laws] was, by holding out a reasonable reward to inventors and giving them an exclusive right to their inventions for a limited period, to stimulate the efforts of genius, the main object was "to promote the progress of science and useful arts." '

"Thirty years later this court, returning to the subject, in Kendall v. Winsor, 21 How. 322, 16 L.Ed. 165, again pointedly and significantly says:

" 'It is undeniably true, that the limited and temporary monopoly granted to inventors was never designed for their exclusive profit or advantage; the benefit to the public or community at large was another and doubtless the primary object in granting and securing that monopoly.'

"This court has never modified this statement of the relative importance of the public and private interests involved in every grant of a patent, even while declaring that, in the construction of patents and the patent laws, inventors shall be fairly, even liberally, treated. Grant v. Raymond, 6 Pet. 218, 241, 8 L.Ed. 376, 384; Winans v. Denmead, 15 How. 330, 14 L.Ed. 717 ; Walker, Patents, § 185."

[14] What we believe to be the view of the Supreme Court has been adequately summarized by Mr. Justice Brandeis as follows:

"The judge came to the bench unequipped with the necessary knowledge of social and economic science, and his judgment suffered likewise through lack of equipment in the lawyers who presented the cases to him. For a judge rarely performs his functions adequately unless the case before him is adequately presented. Thus were the blind led by the blind. It is not surprising that under such conditions the laws as administered failed to meet contemporary economic and social demands. * * * The court reawakened to the truth of the old maxim of the civilians, Ex factor jus oritur. It realized that no law, written or unwritten, can be understood without a full knowledge of the facts out of which it arises and to which it is to be applied. * * *" Address before the Chicago Bar Association January 3, 1916, in The Brandeis Guide to the Modern World, edited by Alfred Lief (1941), pp. 100-101.

Leaders in corporate research have argued that corporate patenting of technical information is in the public interest. Their contention is that corporate research is so expensive that the financing of research would stop if corporations were not offered a monopoly on the information for which they spend their funds. Independent innovators like Henry Kaiser and Edsel Ford repudiate this notion.[15] The argument justifying corporate control of technical information is simply a variation of the larger argument justifying the protection of the investments and dominating position of cartels to insure orderly production and full employment. To those who believe in the economics of free enterprise this position is both unsound and dangerous. But a debate on these opposing economic philosophies is not relevant here because our legislative policy is clearly committed to the proposition that public interest can only be protected through freedom of competitive enterprise to use the technology of our time. It is sufficient, therefore, to say that the policy of the patent law gives no support whatever to monopolies on step-by-step experimentation however expensive that process may be.

The other ground for appellants' motion is that in our opinion it is mistakenly stated that the nominal applicant in this case was employed by a subsidiary of the Bell System in 1928 at the time the application was filed. It appears from the record that he was a research engineer for the Bell System from 1920 to 1928, that he was employed by the Teletype Corporation from 1928 to date. Appellants point out that the Bell System did not acquire stock ownership in Teletype Corporation until 1930. At the time the application was filed Teletype's relationship with Bell consisted in an arrangement for the exchange of licenses which with certain exceptions gave each company the right to use the other's patents.[16] We are glad to make this correction but it affects in no way either the reasoning or the conclusion of our opinion which is intended to apply generally to corporate applications for patents on the discoveries of their research employees.

■ Since our first decision in this case we have decided the case of Monsanto Chemical Co. v. Coe.[17] Even if we were inclined to reconsider our decision we would have to apply the principle laid down in the opinion in that case. The claims before us are eleven out of more than one hundred and seventy made in connection with this machine. Many of the claims were allowed, so that it is not correct to say that appellants have been denied a patent on their discovery. The only question before us is whether the claims allowed by the Patent Office give the applicant protection of sufficient scope. The record does not disclose the claims that have been allowed nor indicate in what respect they do not adequately protect the alleged invention. We have no information as to the amount of control which the applicant can reasonably expect to exercise over the future invention in communication of stock quotations to enable us to determine whether it is so great as to stifle other invention in the same field. Such information is particularly important where the real applicant for the patent is a subsidiary of a corporate system which in the year 1935 owned about 9,000 patents in the communications field and had pending about 1,500 applications for additional patents. The appellant, therefore, has not met the necessary burden of showing that he is entitled to more scope than the Patent Office gave him and the opinion in the Monsanto case would require affirmance.

The motion is denied.

---

15 Hearings, Temporary National Economic Committee, Investigation of Concentration of Economic Power, Part 2, p. 272; Hearings, Subcommittee of the Committee on Military Affairs, U. S. Senate, 77th Cong., 2d Sess. (1942) on S. 2721, Vol. 1, p. 234.

16 Report of Federal Communications Commission, supra note 2, at 242.

17 —— U.S.App.D.C. ——, 145 F.2d 18.