**Robert E. ALLEN, d.b.a. Bob Allen's Gun Club Sportswear, Plaintiff,**

v.

**IDEAL PRODUCTS, INC. and Calvin Bean, Defendants.**

**Civ. A. No. 68–332.**

United States District Court
W. D. Pennsylvania.

June 11, 1969.

**350**

Russell D. Orkin, Webb, Burden, Robinson & Webb, Pittsburgh, Pa., for plaintiff.

William B. Jaspert, Pittsburgh, Pa., for defendants.

## OPINION

DUMBAULD, District Judge.

Before us for disposition is a motion by defendants for summary judgment attacking plaintiff's claim for infringement of a patent relating to a device on a hunting jacket for absorbing the recoil of the gun; together with a motion by plaintiff to dismiss defendants' counterclaim charging plaintiff with an antitrust violation by virtue of attempted misuse of a patent beyond the scope of its monopoly.

*In limine* at the request of the Court the parties briefed the question whether in view of Fashion Originators' Guild of America v. F.T.C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1940), there could exist such a thing as a patent protecting the design of a garment. Both parties agree that the Court's scruples on this point are unfounded; at least many patents have been granted in that field. In that case, it will be remembered, the Supreme Court condemned as "private government" a combination in the garment industry which sought to combat design piracy (312 U.S. at 465, 61 S.Ct. 703). There would apparently have been no occasion for such self-help if legal protection had been available by means of the patent or copyright laws for the "original and distinctive designs" created by members of the association and pirated by the copyists at whom the combination was directed.

Perhaps one sufficient distinction is that in the *Fashion Originators* case the designs involved were merely decorative or ornamental, created to establish a mode or fashion; whereas in the case at bar we are dealing with a functional or utilitarian type of design, intended to protect the sportsman's body against the recoil of his weapon.

 Turning then to the issues that are controlling, we consider the application of the patent laws. In this connection, it must never be forgotten that the primary policy of the patent laws is to promote invention for the benefit of the public. Private gain is secondary. Pennock v. Dialogue, 2 Pet. 1, 7 L.Ed. 327 (1829); Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 510–511, 37 S.Ct. 416, 61 L.Ed. 871 (1917); Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 665, 64 S.Ct. 268, 88 L.Ed. 376 (1944); Mazer v. Stein, 347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed.

630 (1954); Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330–331, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945); Dumbauld, The Constitution of the United States (1964) 153–154. A valid patent must add to, not detract from, the state of the prior art. As stated in Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950): "The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans." Hence it is a public service to strike down an invalid patent, which is in truth a trespass upon the public domain, as Justice Douglas observed in Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 840, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). The very power of Congress to grant a patent is limited and delineated by the purpose proclaimed in the constitutional grant itself. The power is one "To promote the Progress of Science and useful Arts"; the "exclusive Right" conferred by the patent is merely the means of accomplishing the intended result. *Ibid.*, 836–837, 70 S.Ct. 899; Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 154–156, 71 S.Ct. 127, 95 L.Ed. 162 (1950); U.S.Const. Art. I, sec. 8, cl. 8.

"It follows, from the language used in the Constitution, limiting patentability to inventions which in fact contribute to the 'progress' of science that every case involving the validity of a patent presents a constitutional question. Hence the Supreme Court of the United States is often required to devote its time and effort to determinations involving minute questions of fact with respect to the patentability of trivial gadgets."[1]

It follows also, from these basic policies, that commercial success alone, without the requisite invention and novelty, will not establish patentability. Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162 (1950). It further follows that the mere discovery of a phenomenon or law of nature is not patentable. Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948).

It must also be borne in mind that under the 1952 amendment the requirement of novelty is no longer to be interpreted, as in the days of Thurman Arnold, as requiring a "flash of genius".[2] 35 U.S.C. § 103 now states "Patentability shall not be negatived by the manner in which the invention was made." A computerized search, or mere methodical exhaustion of alternatives, might now suffice. Cf. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 335, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945). An accidental discovery is now patentable. Gagnier Fibre Products Co. v. Fourslides, Inc., 112 F.Supp. 926, 929 (E.D. Mich.S.D., 1953). At the same time, 35 U.S.C. 103, as interpreted in the leading case of Graham v. John Deere Co., 383 U.S. 1, 16–17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), added a new requirement of "non-obviousness". This requirement, it seems clear, did not lower the level of inventiveness required. If anything, it increased it by making a statutory requisite of criteria theretofore embodied only in judicial decisions.

In the light of these doctrines we examine the facts shown in the case at bar. The Allen patent, No. 2,948,899, issued August 16, 1960, upon which plaintiff relied, has two claims. The second is merely for the garment described in Claim 1, which describes a "wrinkle free gun butt pad for shooting garment".

1. Dumbauld, The Constitution of the United States (1964) 154.

2. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58 (1941); Monsanto Chem-

ical Co. v. Coe, 79 U.S.App.D.C. 155, 145 F.2d 18, 23 (1944). In the words of the poet "Non sum qualis eram bonae sub regno Cynarae." Horace, Odes, IV, i, 11. 3–4.

The claimant concedes that previous efforts to prevent wrinkling had been made by stitching or quilting the pad to the garment. Allen's claim is to the use of a resilient pad which is supposed to exert an anti-wrinkle force on the gun butt bearing element and the pocket in which the pad is inserted.[3]

The two principal advantages claimed are that the pad is resilient and that it is removable. Thus the garment can be cleaned more readily, and pads of varying thickness (or no pad at all) can be used at the sportman's option.

We turn now to the prior art as disclosed in earlier patents, and the history of the Allen application in the Patent Office. Defendants argue that plaintiff amended out during these proceedings the features which defendants are now charged with infringing; in other words that plaintiff's action is subject to the defense of "file wrapper estoppel". Leggett v. Avery, 101 U.S. 256, 259, 25 L.Ed. 865 (1879).

Allen filed his application July 18, 1957. On November 19, 1957, the Examiner rejected it, referring to prior patents by Evans (No. 2,302,368) and Mulvey (No. 2,247,961). Mulvey dealt with a pneumatic pad for football players, to be inserted in a pocket flap attached on the inside of the pants. Evans used a latex pad glued or cemented to the outside of the shooting jacket.

Plaintiff's attorney then argued that Evans had emphasized the preferability of a securely fastened pad, and thus pointed in a direction different from the removable pad claimed by Allen.

The Examiner on October 10, 1958, again rejected Allen's amended applica-tion, referring also to the patents of Petmecky (No. 849,266) and White (No. 727,243). Petmecky, in 1907, described a resilient or "cushioning" pad to be inserted on the inside of the garment at a point directly opposite to the resting place of the gun butt. His pad could either be sewed or otherwise permanently attached to the inside of the garment, but preferably was attached by snap-fasteners ("spring buttons and sockets").

White's knee protector (1903) was a pad removably inserted in a pocket on the outside of the trousers at the knee.

Counsel again argued that Evans did not use a removable pad, and that a pad fastened by snaps as by Petmecky could not exert a straightening or anti-wrinkle effect.

A different Examiner rejected this amended application on November 19, 1959, again referring to the prior patents of Evans, Petmecky, and White. The Examiner added this dictum: "If applicant would recite the gun butt bearing element as secured to the front surface of the front panel and the pocket secured to the rear surface of said front panel with the resilient pad received in said pocket, one or two claims may be deemed allowable."

Applicant on January 7, 1960, dismissed his Des Moines attorney and employed a Washington firm. After a conference with the Examiner the new lawyer filed an amendment on February 17, 1960, and allowance was granted promptly on March 21, 1960. Possibly everything went according to Hoyle, but to a skeptical mind filled with the recent Fortas disclosures and recollections of the practices employed in the glass in-

---

3. The exact wording of Claim 1 is as follows: "A garment having an anti-wrinkle set gun butt pad comprising; a back panel; a pair of front panels jointed to said back panel at the shoulders and lower sides; a pliable, rough surfaced gun butt bearing element secured to the front surface of one of said front panels and extending from the shoulder to approximately the armpit line thereof; said pliable, rough surfaced gun butt bearing ele-ment being quilted to said one front panel; a pocket secured to the rear surface of said one panel behind and generally coextensive with said pliable, rough surfaced gun butt bearing element; and a resilient, moisture proof, pad, thin in relation to its length and width, filling said pocket to exert an anti-wrinkle set, straightening force on said pocket and said pliable, rough surfaced gun butt bearing element."

dustry cases, it gives the little grey cells to think furiously, as Hercule Poirot might have said. See United States v. Hartford-Empire Co., 46 F.Supp. 541, 612 (N.D. Ohio W.D.1942); Hartford-Empire Co. v. United States, 323 U.S. 386, 400, 65 S.Ct. 373, 89 L.Ed. 322 (1945); Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 241–243, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); Hartford-Empire Co. v. Shawkee Mfg. Co., 163 F.2d 474, 475–476 (C.A. 3, 1947); Hatch v. Ooms, 69 F.Supp. 788, 794–801 (D.C.1947). For a good account of the legitimate and valuable services of Washington lawyers, see Charles A. Horsky, The Washington Lawyer (1952) 51–59, 70–117, 154.

The amendment which led to allowance of the claim simply recited that "the bearing element is secured to the front surface of one of the front panels and that the pocket is secured to the rear surface of such panel". This is characterized as a "structure" not described in the prior art.

In other words, in Evans the pad was glued to the outside of the garment. So too, White's knee pad was inserted in a pocket on the outside of the garment. Mulvey's pad was on the inside of the garment. Petmecky's pad was also on the inside of the garment, and directly opposite the resting-place of the gun, but was not held in place by a pocket but by snap-fasteners. Moreover, Petmecky did not have a gun-butt bearing element affixed to the front of the garment opposite the inner pocket containing the pad.

From the Evans patent it is clear that use of gun-butt bearing elements of rough or friction-producing type on the outside of hunting garments has long been common.

It is difficult to perceive why the addition of such a common feature on the outside of the garment should make patentable the Allen claim (whose essence is a resilient removable pad contained in a pocket on the inside of the garment) if it were otherwise unpatentable.

It seems clear that a resilient and removable pad on the inside of the garment was anticipated by Petmecky. Using a pocket rather than snap-fasteners to attach the pad was anticipated by Mulvey. As the Examiner well said on November 19, 1957, "Evans shows a shooting jacket with a butt pad as recited herein * * *. To use the removable pad in Evans would be a mechanical expedient. * * * Mulvey shows pockets on the interior of the garment." In this connection it must be remembered that Petmecky showed the interior pad as being placed opposite to or coextensive with the place where the gun butt would rest. The entire structure of Allen's alleged invention was thus disclosed in the prior art as established of record in the Patent Office. The Allen patent is therefore void.

Moreover, we find no infringement in the defendants' garments as exhibited to the Court. Three samples were offered. In method A, the pad is stitched perpendicularly to the inner side of the pocket (as well as along the top edge of the pocket). In method B, the pad is attached to the front side of the pocket. Under method C the stitching is partly horizontal and partly perpendicular. None of these types infringe Allen's claim, which is for a removable pad simply inserted in a pocket, with no fastening by gluing or stitching. Those methods of fixed attachment were urged in the file wrapper as characteristic of the Evans patent, from which the Allen claim was distinguished by its removability, which was recited as one of its principal advantages.

It is true that in a short time the stitching can be undone and the pad removed, but an unsightly ragged edge is left at the top of the pocket, and it may be assumed that most hunters are "he-men" and not seamstresses capable or desirous of individually redesigning and modifying the garments they purchase.

With respect to the defendants' counterclaim for violation of the antitrust laws, we feel that this is of little

importance in the light of our findings of invalidity and non-infringement. It is of course true that misuse of a patent or extension of the monopoly to unpatented articles beyond the scope of the legal monopoly conferred by the patent is a violation of the antitrust laws. But ordinarily a licensing agreement or complicated arrangement is used to make the restraint of trade effective. Here we have a simple patent case; the basic issue is whether or not the patent is valid or infringed; and it would be going too far to say that every patent case is *per se* an antitrust case. It is enough to have to say that every patent case presents a constitutional question, as we have noted above.

For the foregoing reasons, defendants' motion for summary judgment is granted, and plaintiff's motion to dismiss counterclaim is likewise granted.