## KENDALL CO. v. TETLEY TEA CO., Inc.
### Civ. No. 6984.

United States District Court,
D. Massachusetts.

April 10, 1950.

As Amended April 17, 1950.

See also 81 F.Supp. 387.

---

H. L. Kirkpatrick and Edgar H. Kent of Fish, Richardson & Neave, Boston, Mass., for plaintiff.

T. Clay Lindsey, Hartford, Conn., George P. Dike, Boston, Mass., George P. Towle, Jr., Boston, Mass., for defendant.

SWEENEY, Chief Judge.

In this action the plaintiff seeks an injunction against and damages for an alleged infringement of its Patent No. 2,-277,050, which was applied for on August 31, 1940, issued on March 24, 1942, to Reed and Ryan, and assigned by them to the plaintiff. The defendant denies infringement and asserts the invalidity of the patent on several technical grounds which will be discussed hereinafter. The claims in suit are Nos. 1, 2, 3, 5, 12; and 14, and claim 4 by reference. Throughout this opinion there will be references to a patent numbered 2,277,049, which is a parent application to the one in suit. It must be clearly understood that 2,277,049 is not in suit in this action.

These claims relate to an infuser made of an unwoven, thermoplastically bonded fabric. The Tetley Tea Company, Inc., which manufactures the accused tea bags, is only a nominal defendant, the real defendant being C. H. Dexter & Sons, Inc., of Windsor Locks, Connecticut, which supplies the Tetley Tea Company with the material from which the accused tea bags are made. Dexter openly conducted the defense of this action and has undertaken to indemnify Tetley for any losses accruing as a result of it. While the action does not involve "all of the tea in China" it does directly involve the major portion of the tea bag industry, all of which is supplied by the defendant Dexter with its fabric.

## Findings of Fact

The plaintiff is a large manufacturer of gauzes and surgical dressings, and controls other corporations such as Bauer & Black. With the advent of chemical fibers such as nylon and vinyon, this company, in common with many of its competitors, saw the possibility of producing a fabric which needed to be neither spun nor woven, thus eliminating two expensive steps in the process of textile fabrication. Plaintiff's first attempt to solve this problem involved the use of fibres of cellulose acetate which were made adhesive by union with a solvent in a "wet process". This was unsuccessful. Plaintiff was successful when it used a "dry process" and introduced the acetate into the mass of textile fibers, prior to their being carded into a web. Cellulose acetate fibers are latently thermoplastic, by which it is meant that they tend to coalesce and to adhere to themselves (and to any other fibres present in the web) when subjected to heat and pressure. Therefore, by passing this carded web through heated calendar rolls it became a fabric possessing tensile strength without having been spun and woven. Furthermore, plaintiff discovered that this fabric continued to retain latent thermoplasticity so that several such unified webs could be superposed, one upon another, and again run through heated rolls, with the result that a thicker and stronger laminated fabric ensued. Finally plaintiff

learned that the amount of thermoplastic fiber in the webs of such a laminated fabric could be varied so that one surface would contain a high thermoplastic concentration and the other surface a low one. Thus the adhesive character of the fabric under the application of heat and pressure could be varied on each surface.

However, heat sufficient to cause the acetate to become usefully adhesive scorched it because the point at which it becomes adhesive is very close to its deterioration point. Therefore, plaintiff needed a plasticizer, the function of which would be to lower the temperature at which the acetate fibers would become adhesive. Plaintiff, which was not in a position to manufacture a plasticizer eventually found what it needed in plasticizers provided by the Monsanto Chemical Company, called Santicizers. The laboratory notes of Reed, one of the co-patentees, indicate that in September of 1936 plaintiff produced a strong, bonded fabric which did not scorch when heated, composed of thermoplastic fibers (cellulose acetate), non-thermoplastic fibres (bleached cotton), and Santicizer No. 8. This fabric was covered by Letters Patent No. 2,277,049 (hereinafter called "049"), applied for November 6, 1939, and issued to the plaintiff on the same date as the patent in suit. The application which resulted in 049 was a continuation of one filed in July, 1935, Serial No. 30,022, which was a disclosure substantially the same as that made in 049. The trade name given this fabric was "Webril".

Prior to February of 1937 Reed and other researchers for plaintiff discovered that Webril was porous and that the degree of its porosity could be varied according to the percentage of thermoplastic fiber contained within it. Plaintiff knew that when immersed in water although all other fiber-to-fiber bonds in Webril bonds were loosened, those caused by thermoplastic adhesion remained firm. By varying the amount of plasticizer in the fabric its critical temperature of thermoplastic adhesion could be established above that of boiling water so that, when immersed in boiling water, the fabric would not disintegrate. All of these were prime neces-

sities in the development of a fabric for an infuser to be used in a liquid, such as for making tea, and with the acquisition of this knowledge plaintiff, prior to February of 1937, conceived of using Webril in a tea bag infuser.

In February of 1937 Ryan began work with plaintiff, and there is no evidence to disprove the proposition that he contributed to the further development of Webril as it took place after that date. Plaintiff at this time had a fabric which was porous, which retained tensile strength in water, even when the water boiled, and which could be manufactured cheaply because it was chemically bonded and neither spun nor woven. To reduce to practice Reed's idea of using it as a tea bag, Webril had to be produced in a form which was tasteless, non-toxic, and heat-sealable. Initially toxicity and bad taste were prevented by kier-boiling the fabric in an alkali solution. This increased the cost of manufacture, weakened the fabric's tensile strength by 15%, and regenerated the cellulose acetate with the result the Webril lost its thermoplastic property and could not be heat-sealed. Kier-boiling had been necessary because all plasticizers thus far used in Webril, when an attempt was made to adapt it to food infusers, degenerated in water which gave the water a bad taste. Reed was not sure that such plasticizers were non-toxic, despite the fact that Monsanto, which manufactured the plasticizers used by Reed, guaranteed them to be non-toxic. Further obstacles to be overcome before the goals of freedom from bad taste and toxicity were reached required the selection of a particular type of bleached cotton and the assurance that the water used to process this cotton was pure. Finally, to perfect a Webril tea bag it was necessary to determine the correct proportion of each of the three elements—cotton staple, thermoplastic fiber, and placticizer—to include in the web to make it perform most efficiently.

In order to elminate kier-boiling, and to permit Webril to remain heat-sealable, non-toxic, and tasteless, Ryan and Reed selected Santicizer E-15 as its plasticizer when used in a tea bag. Although Reed had known of this Santicizer and used it in Webril before 1937, he had not used it in a fabric which had been tested for use as a tea bag, or if he had done so, he had not assured himself that the fabric was non-toxic and tasteless in virtue of the use of E-15, evidence of which is the fact that he had kier-boiled all such fabrics before Ryan began to work on the problem. Ryan also helped in the solution of the other problems to be solved, i.e. the selection of a proper type of bleached cotton, the evolution of a process for producing it which used sufficiently pure water, and the selection of the proper proportion of the three elements in Webril to make it useful as a tea bag. The adaptation of Webril to a tea infuser was accomplished in September of 1939 and the suit patent was applied for in August of 1940, about a year later.

The defendant's answer has raised four issues: (1) whether the suit claims possess invention; (2) whether the patentees abandoned them; (3) whether the patentees are the original inventors, 35 U.S.C. A., § 35; and (4) whether the defendant has infringed upon plaintiff's claims.

### Invention

The claims in suit can be summed up by the following analysis. They cover a fabric or sheet material containing fibers which are heterogeneously intermingled, unspun, water-insoluble and bonded. The bond is caused by latently adhesive fibers which are distributed discontinuously and substantially throughout the sheet material, which do not become coalescent at temperatures equaling that of boiling water, and which are concentrated more highly on one surface of the sheet material than on the other. As a result, this sheet material is highly pervious to air and to liquids but prevents sifting of dry particles of solids. Thus, when made into an envelope it is useful for enclosing a material to be infused in a liquid. The suit claims cover this material only when it is made into such an envelope by uniting the marginal portions of two sheets of this material thermoplastically. Claim 14 (which incorporates claim 4) of Letters Patent No. 2,277,050

(hereinafter called "050"), which is representative of this disclosure, reads as follows: "An infuser comprising a porous envelope for enclosing a material adapted to be infused in a liquid, a substantial portion at least of said envelope consisting essentially of an unwoven sheet material composed of unspun fibers and a water-insoluble binder distributed in a discontinuous form substantially throughout said portion of the envelope, said binder and said fibers being adhesively united into a sheeted structure, highly pervious to air and water but capable of substantially preventing sifting of dry particles of said material therethrough, said binder having normally latent adhesive properties adapted to be developed by heat. Said binder (in this infuser) is present in fiber form and the concentration of binder fibers is considerably higher in one surface of said sheet material than in the opposite surface."

■ The parent Webril patent, 049, which is not in suit, anticipated many of these disclosures. It was a claim to a fabric containing a combination of a common textile fiber, such as cotton, a thermoplastic fiber amenable to dry processing such as cellulose acetate, and a plasticizer such as Santicizer E-15. Invention in the suit claims must involve more than this. More specifically, in the terminology of the suit claims, 049 taught: (1) the creation of a bonded fibrous structure of sheet material made of heterogeneously intermingled fibers; (2) the inclusion of water-insoluble fibers in such a material (p. 5, col. 1, lines 12, 44); (3) the use of latently adhesive or thermoplastic fibers as a fabric binder; (4) the control of the temperature at which the latent adhesiveness of the thermoplastic fibers may be developed (p. 2, col. 2, line 43; U. S. Patent No. 1,903,960, p. 2. col. 1, lines 31–36; U. S. Patent No. 1,829,585, p. 2, col. 1, lines 18–25, 49–52; (5) the substantial and discontinuous distribution of binder fibers throughout the fabric (p. 2, col. 1, lines 4–45); (6) the control of the fabric's degree of porosity (p. 3, col. 2, lines 29–34; U. S. Patent No. 1,903,960, p. 1, col. 2, lines 67–73); (7) the presence in the fabric of binder fiber in sufficient quantities to unite two sheets of it by heat-sealing (p. 4, col. 1,

lines 57–67). Although 049 was issued on the same date as 050, there can be no question that it is relevant prior art because it is a continuation of an application filed July 5, 1935, more than five years prior to the filing of the suit claims. Western States Machine Co. v. S. S. Hepworth Co., 2 Cir., 1945, 147 F.2d 345, 348.

A comparison of the foregoing with the elements of the suit claims requires the conclusion that the advance of the suit claims over 049 consists in the conceptions of (1) concentrating thermoplastic fiber more highly on one surface of the material than on the other, and (2) using Webril's combination of the qualities of wet strength and porosity in a food infuser such as a tea bag. With regard to the latter, there can be no invention in the mere concept, without more, of using a fabric or sheet material as a food infuser, because both plaintiff and defendant have submitted in evidence a number of prior art tea bag patents which disclose this. Nor can there be invention in the new use in a food infuser of characteristics of a fabric which are old and disclosed by prior art, such as Webril's wet strength and variable porosity. Ansonia Brass Co. v. Electrical Supply Co., 1892, 144 U.S. 11, 18, 12 S.Ct. 601, 36 L.Ed. 327; General Electric Co. v. Jewell Incandescent Lamp Co., D.C.N.J.1942, 47 F.Supp. 818, affirmed 1945, 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43. Invention must consist in the addition to that fabric of a new characteristic unknown to analogous prior art by virtue of which it is useful as a food infuser. Consequently, what must be invented is a new fabric, and the suit patent's claim to the use of this fabric as an infuser serves only to limit the scope of the monopoly claimed over the new fabric, and cannot contribute to the fabric's quality of invention.

Plaintiff has discovered and disclosed several modifications of Webril which make it especially useful as a food infuser. Plaintiff has made it tasteless and non-toxic by using Santicizer E-15 as a plasticizer, and by discovering a process of producing the type of pure, bleached cotton fibers which is needed. Plaintiff has learned the proper proportion of thermoplastic to non-

thermoplastic fiber for achieving that degree of porosity in Webril which allows it to be useful in a tea bag infuser. However much these discoveries have involved invention, they cannot contribute to the validity of the suit claims because the suit claims do not cover them. Plaintiff has disclosed them but has not claimed them. Furthermore, it must be noted that these discoveries are useful only in a food infuser, and the suit claims by their terms do not cover a food infuser (a fortiori a tea bag infuser) but refer to infusers generally. To the extent the suit claims should be literally construed, therefore, the fabric's lack of toxicity and its tastelessness have nothing to do with the suit claims' quality of invention.

However, plaintiff has claimed, and disclosed, a new quality of Webril without which it would not be useful as a food infuser, i. e. its concentration of thermoplastic fiber on one surface by superposing and laminating webs with different amounts of thermoplastic fiber. The utility of this lies in the fact that when the fabric is heat-sealed the surfaces which are rich in thermoplastic fiber can be juxtaposed, and the surfaces which are lean will not adhere to the dies of the heat-sealing machine. Thus it is possible to manufacture the infuser envelope cheaply. Claims 4 and 14 are literally to "an infuser comprising a porous envelope * * * consisting * * * of an unwoven sheet material (containing) . * * a water-insoluble binder distributed in a discontinuous form substantially throughout (a substantial portion) of the envelope * * * the concentration of binder fibers (being) considerably higher in one surface of said sheet material than in the opposite surface." This quality, while it may be new in Webril, is old in both the paper and the textile arts. The use of adhesive in the ordinary stationery envelope comes to mind as an example in the paper art, and U. S. Patent No. 1,903,360 issued to Dreyfus, April 18, 1933, discloses a fabric one surface of which is thermoplastically adhesive. The Dreyfus fabric differed from Webril, however, in that it was a spun and woven sheet material. The concentration of thermoplastic fibers on one surface is achieved

as it is in Webril, by laminating a thermoplastic upon a non-thermoplastic sheet of material. It differs from the fabric covered by the suit claims in that the thermoplastic fibers are not "distributed in a discontinuous form substantially throughout" the material. This prior art therefore serves only to indicate that there is no invention in the concept, without more, of concentrating thermoplastically adhesive fibers on one surface of a fabric.

Construed literally, claims 4 and 14, which are the only claims in suit which cover the thermoplastic adhesiveness of plaintiff's fabric, include no more than a claim to such concentration of fibers. Therefore, if construed literally, these claims lack invention. Furthermore, if these claims are so construed, they must be held invalid, because they cover more than what has actually been discovered. Plaintiff's problem lay in the fact that if both surfaces of the fabric were equally thermoplastically adhesive, when two sheets of the fabric were placed between the jaws of a heat-sealing machine, they would not only adhere to each other but also to the heat-sealing dies. The patentees knew that the source of adhesion was fibers *within* the fabric. Therefore their problem actually was to discover a way of concentrating these fibers on the heat-sealing surface of the sheet material. The answers to this could be several, e. g. uniting a thermoplastic with a non-thermoplastic web, coating one side of the web with thermoplastic material, adding an adhesive coating along the borders of the paper, or the use of a wet process such as outlined below in the discussion of the defendant's process under U. S. Patent No. 2,414,833 issued to Osborne on January 28, 1947. There could be no invention in understanding the nature of the problem to be solved, and claims 4 and 14 disclose only a statement of this problem, and not an explanation of any of the above solutions.

 A patent is a monopoly, and cannot be given a scope so great that future inventive work in its field would be stifled by its grant. For this reason claims to ideas, or to the function of a product, are not valid unless accompanied by a claim to the

means by which the ideas become useful or by which the product functions. Claims must be limited as closely as possible to that which the patentee discovered, Monsanto Chemical Co. v. Coe, 1945, 79 U.S.App.D.C. 155, 145 F.2d 18, 21, and what he has discovered is demonstrated by his disclosure of his discovery in the specifications of his patent· Schering Corporation v. Gilbert, 2 Cir., 1946, 153 F.2d 428, 433, 435. If a claim to an idea is invalid, a claim to the discovery of a problem to be solved, which does not disclose its solution as in claim 14, is either invalid as covering more than what has been invented, or must be construed within the limitations of what has been invented and disclosed. A conclusion tantamount to this has been reached by the Supreme Court when it stated the rule that a claim to a result or a product, by whatever means produced, is invalid when only one means of producing it is discovered and disclosed. United States Repair & Guaranty Co. v. Assyrian Asphalt Co., 1902, 183 U.S. 591, 600-601, 22 S.Ct. 87, 46 L.Ed. 342; Holland Furniture Co. v. Perkins Glue Co., 1928, 277 U.S. 245, 255, 48 S.Ct. 474, 72 L. Ed. 868; General Electric Co. v. Wabash Co., 1938, 304 U.S. 364, 371, 58 S.Ct. 899, 82 L.Ed. 1402; Hildreth v. Lauer & Suter Co., D.C.Md.1913, 204 F. 792, 796.

Where possible, it is the more desirable course to construe a claim narrowly and within the limits of the disclosure of the specifications in order to preserve its validity· Western States Machine Co. v. S. S. Hepworth Co., 2 Cir., 1945, 147 F.2d 345, 349. However, when the claim makes no reference to the specifications in virtue of which it sought to construe it narrowly, it must be declared invalid. Altoona Public Theatres v. American Tri-Ergon Corp., 1935, 294 U.S. 477, 487, 55 S.Ct. 455, 79 L.Ed. 1005; McCarty v. Lehigh Valley Railway Co., 1895, 160 U.S. 110, 116, 16 S.Ct. 240, 40 L.Ed. 358. Neither claim 14 nor claim 4 of the patent in suit makes any such reference, and moreover at the close of the specifications, prefatory to setting forth their claims, the patentees state: "While we have herein disclosed a preferred form of our invention, it will be evident that some, or all, of the advantages and novel features of the invention may be obtained in modified embodiments of it."

This rule is modified slightly in General Electric Co. v. Wabash Corp., 304 U.S. 364, 374, 58 S.Ct. 899, 904, 82 L.Ed. 1402 where the court said, "Finally, the product claims may not be saved by a limitation to products produced in accordance with the process set out in the specification. * * * Putting aside questions as to the general propriety of such a construction, unless the claim uses language explicitly referring to the method of preparation, *or describing the product in phrases suggestive of that process,* to save the product claim in this fashion would constitute an improper importation into the claim of a factor nowhere described there."

The question therefore arises whether claims 4 and 14, considered as combined, use language describing the product in phrases suggestive of the process· Claim 14 certainly does not, but claim 4 speaks of the binder fibers (which claim 14 predicates as "concentrated" on one surface of the material) as being distributed discontinuously throughout a substantial portion of the envelope. Thus these claims, considered together, could conceivably be construed as suggesting the method by which the binder fibers are concentrated upon one surface of the material. However, in the light of plaintiff's disclaimer of any limitation of the claims by the specifications quoted above, plaintiff's intent was plainly to claim a heat-sealable envelope where the binder fibers are concentrated by any means on one surface of the material. This conclusion is reinforced by the very fact that plaintiff accuses Dexter & Sons of infringing when Dexter's process is quite different from that disclosed by 050, as discussed below. It is necessary to hold that the suit claims do not come within the exception suggested by the language contained in General Electric Co. v. Wabash, supra. It is noted that this rule and its exception are implicitly approved in dicta contained in United Carbon Co. v. Binney & Smith Co., 1942, 317 U.S. 228, 235–236, 63 S.Ct. 165, 87 L.Ed. 232.

Therefore it is not possible to construe claims 4 and 14 in suit as within the disclosures of the specifications, and claim 14 must be held invalid because it claims a monopoly over more than has been invented. It is necessary to find that all the claims in suit are invalid for want of invention because either they are disclosures which are taught by prior art or they claim a monopoly broader than the scope of what has been invented.

### Abandonment

There is nothing to the contention that the patent is invalid by reason of actual or statutory abandonment, nor was this point stressed by the defendant either in argument or briefs.

### Origin of Invention

Defendant has contended that the plaintiff's patent is invalid because Reed conceived of and reduced to practice an infuser, such as that to which claim is made, before Ryan began work on the suit device in February of 1937, consequently, because Ryan was not one of the original inventors of the suit device and could not make an oath to that effect in compliance with 35 U.S.C.A. § 35. Reed's laboratory notes indicate that prior to September, 1936, he had reduced to practice the conception of a laminated, thermoplastically bonded, porous sheet material, and that he had made a tea bag from such material secured at its margins by stitching and not by heat sealing. These bags are noted as having been "bleached and boiled" from which it is reasonable to conclude that kier-boiling was still thought necessary to insure against toxicity and bad taste. Therefore, the problem remaining to be solved with the help of Ryan was that of composing a material which was tasteless and non-toxic when immersed in water, but which did not have to be kier-boiled and thus deprived of its latent thermoplasticity. The answer lay in the selection of the proper plasticizer, properly processed bleeached cotton, and a water-insoluble binder fiber. But the use of a water-insoluble binder fiber in Webril is taught by 049, and the co-patentees made no claim to the use of Santicizer E-15, to the generic chemical constituents of any plasticizer, nor to the use of cotton in their fabric much less to any type or method of processing bleached cotton. Therefore, Ryan's contribution to the development of the fabric covered by the suit claims did not endow those claims with the characteristic of invention. However, if the suit claims are construed to be limited to a food infuser, Ryan's work did serve to endow them with utility because a fabric would be useless as a food infuser until it was proven non-toxic and until it was tasteless. Because an inventor is one who produces, among other things, a device which is useful, according to 35 U.S.C.A. § 31, Ryan, by making the fabric thus useful, became one of its inventors. Because he was the first to endow the suit device with this aspect of its utility, he could truthfully make an oath that he was one of the original and first inventors in compliance with 35 U.S.C.A. § 35.

If, however, the suit claims are construed to cover all infusers, the suit device was reduced to practice without Ryan's help, because a useful heat-sealable infuser fabric could have been made by plaintiff before Ryan's work on tastelessness and toxicity. The record contains no evidence that a heat-sealed envelope was actually produced before Ryan became associated with plaintiff, but the manufacture of laminated webs indicated that it was plainly possible to do so, and such a step would merely be the expected action of one skilled in the practice. Thus, if the claims in suit cover infusers generally, Ryan would have contributed nothing to the invention of such infusers and would not have been one of the original inventors.

This section of the opinion could be and ordinarily would be omitted because the issue of originality requires the court to make a decision on the construction of 050 which is a difficult one. This case was presented for trial, however, in a manner which allowed the issue of originality considerably to confuse the evidence which was relevant to a decision re invention. It is believed the above discussion will permit the litigants to clarify their position should an appeal be taken from this decision. In-

sofar as it is necessary to decide this issue of construction I conclude that the claims in suit cannot be confined to food infusers in the light of the considerations stated above which preclude the modification of the claims by construing them within the limitations of the specifications. Therefore, Ryan is not one of the original inventors.

### Infringement

The accused tea bag is composed of a material which is made by the process of papermaking. This is done by flowing a very dilute mixture, made of very short vinyon fibers which are thermoplastic, and non-thermoplastic fibers such as Manila hemp, caroa, jute, Indian hemp, or viscose, onto a Foudriniere wire or screen. The water sifts through the screen, which is moving, and leaves a thin mat of wet fibers which are transferred in their matted form to heated rollers. Under pressure and with the application of heat the fibers are bonded or unified by a mechanical interlocking called "paper makers' bond", caused by their dehydration and irregularity. The resulting sheet of paper normally differs from a chemically bonded textile fabric in that paper fibers tend more to break when they are bent, and the paper is less porous than the fabric as a rule. These differences are principally caused by two facts. Short fibers, on the average three-sixteenths of an inch in length, must be used in the paper mix to prevent their uniting and clotting prior to their distribution on the Foudriniere screen, whereas the dry process by which a textile web is carded for bonding not only permits but requires the use of appreciably longer fibers. Secondly, the mechanical bond which unites fibers in paper crowds them together and makes them relatively immobile in relation to one another, whereas the thermoplastic, chemical bond which unites fibers in such fabrics as Webril leaves free from adhesion a major portion of the length of each fiber, thus leaving space between the fabric's fibers and allowing them to adjust to one another.

C. H. Dexter & Sons, Inc., which manufactures the paper from which the accused tea bags are made, uses a manufacturing method which minimizes the differences between paper and a chemically bonded fabric. This method was discovered by one of the defendant's witnesses at the trial, F. H. Osborne, employed by C. H. Dexter & Sons, Inc., and is outlined in United States Patent No. 2,414,833 issued to him on January 28, 1947. Osborne had previously discovered that long fibers, almost of textile length, could be mixed and laid on the Foudriniere screen in a wet process by floating them onto it in a very dilute mixture. Thus his paper became porous. In order to make it useful as a filtering medium, however, it was necessary that it retain tensile strength when immersed in water. When ordinary paper is so immersed its fibers lose their rigidity and the mechanical paper makers' bond which unites them is destroyed by this pliability. To avoid this, Osborne used a melamine resin coating which is not thermoplastic as the principal chemical binding agent in his paper. This bond to a limited extent was incremented by a mechanical interlocking of the material's fibers which, by itself, could not give the material sufficient tensile strength in water to make it useful.

The first basis for plaintiff's accusation of infringement against Osborne's paper is his inclusion in it of vinyon, a thermoplastic fiber which gives his paper tensile strength. It must be noted that this accusation fails in any event when the claims in suit are used to support it, because the attempt to cover by the suit claims the discovery of the usefulness of a thermoplastic fiber as a binding agent in a fabric or sheet material is anticipated by 049, the parent Webril patent, and it is not plaintiff's contention that the defendant has infringed upon 049. However, assuming the validity of this aspect of the suit claims, plaintiff's accusation must fail in this regard because the function of vinyon in Osborne's paper is not to give it tensile strength, but to permit it to be heat sealed. Comparison of plaintiff's fabric with the accused paper under a microscope reveals that the adherence of thermoplastic to non-thermoplastic fibers in the fabric is markedly greater than in the paper. And as demonstrated at the trial, when both sheet

materials are immersed in acetone to destroy whatever thermoplastic bond exists within them, plaintiff's fabric deteriorates and almost entirely loses its tensile strength, whereas such immersion does not appear to affect Osborne's paper at all. Thus Osborne's paper retains almost the same degree of tensile strength without vinyon fibers, and when immersed in a liquid, as it does with them. The fact therefore is that thermoplastic material in the accused paper operates to some extent, but only incidentally and non-functionally, as a binder. There could be no infringement in this regard unless plaintiff is in a position to claim *all* use of thermoplastic fibers in a sheet material in virtue of which these fibers act as a binder to *any* extent, however accidentally and non-functionally.

Granting that Osborne uses vinyon to render his paper heat sealable, the second basis for plaintiff's accusation of infringement is claim 14 of the patent in suit, which covers a concentration of thermoplastic fibers on one surface of the sheet material. Osborne's method for achieving this result in his paper is to introduce into the dilute mixture flowing onto the Foudriniere screen his thermoplastic fibers at an interval appreciably following the moment when he introduced into it the non-thermoplastic fibers. Thus the non-thermoplastic fibers sink to the bottom of the mixture before the thermoplastic fibers have an opportunity to do so, and the mat of fibers left on the screen after the water has sifted through contains a richer concentration of thermoplastic fibers on its upper surface than on its lower. Thus Osborne does not have to superpose and laminate sheets of material with varying amounts of thermoplastic fibers to achieve his result, as does plaintiff.

As indicated above, in order to find invention in plaintiff's claims in this regard, they would have to be construed within the limitations of the process disclosed by the specifications of the patent in suit. As thus construed there can be no question that Osborne's paper would not infringe in its heat-sealing characteristics. And the very fact that paper produced by a process so different from plaintiff's, and which bears no relation to the disclosures of plaintiff's patent, would infringe upon plaintiff's claims 4 and 14 if the latter claim were literally construed, is conclusive evidence that these claims cover a monopoly so clearly exceeding what plaintiff discovered that they must be held invalid.

### Conclusions of Law

From the foregoing I conclude and rule as follows:

(1) That claims Nos. 1, 2, 3, 5, 12, and 14 (and claim 4 by reference) are invalid;

(2) That, assuming the validity of claims Nos. 1, 2, 3, 5, 12, and 14 (and claim 4 by reference), the defendant's fabric does not infringe upon the plaintiff's patent.

When defendant's exhibit 51 was offered at the trial, objections were made to its being introduced in evidence on the ground that it had not been indicated that it would be relied upon as prior art. The Court took the question of its admissibility under advisement but now rejects the exhibit. Needless to say, no use of it was made in reaching our conclusion, nor was it particularly pertinent to any issue raised.